## UNITED STATES DISTRICT COURT
## IN THE DISTRICT OF MINNESOTA

| | |
|---|---|
| NorthStar Business Enterprises, LLC and L. Londell McMillan, | Case No. 0:24-CV-03492-NEG-DTS |
| Plaintiffs, | |
| vs. | **AMENDED COMPLAINT** |
| Sharon Nelson, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs NorthStar Business Enterprises, LLC ("NorthStar") and L. Londell McMillan ("McMillan") as and for their Amended Complaint against Defendant Sharon Nelson ("Nelson") state and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      McMillan is, and at all time material to this action has been, a citizen of New York. At all times material to this action he has resided in, been domiciled in, and been a resident of the state of New York.

2.      NorthStar is a limited liability company organized under the laws of the State of Delaware. McMillan is NorthStar's sole member. McMillan is, and at all time material to this action has been, a citizen of New York. At all times material to this action, he has resided in, been domiciled in, and been a resident of the State of New York.

3.       Nelson is, and at all times material to this action has been, a citizen of the State of Minnesota. At all times material to this action, she has resided in, been domiciled in, and been a resident of the State of Minnesota.

1

4.     This Court has original jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and the properly joined and served Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides and conducts business in Minnesota, and the events and omission giving rise to this claim occurred in Minnesota.

## NATURE OF THE ACTION

6.     This is an action for breach of contract on a promissory note and for other loans advanced, unjust enrichment, defamation and business disparagement arising from money advanced by Plaintiffs to Nelson, as well as actions and inactions taken by Nelson prior to and during her membership in Prince Legacy, LLC ("Prince Legacy" or the "Company"), the entity that owns and co-manages the valuable and sophisticated assets of the late music icon, Prince Rogers Nelson ("Prince").

7.     McMillan was asked by Nelson to support her, and he invested and devoted years of his life in guiding Nelson and other members of Prince Legacy through the Prince probate proceeding and the closing and distribution of Prince's Estate, setting up the corporate structures necessary to accomplish distribution of Prince's Estate, finding and paying for competent advisors to aid them in this process, fighting Nelson's and the other Prince Legacy members' numerous legal and business battles, arranging support and counsel for her wrongful death claims, and assisting Nelson with numerous claims and settlements she initiated with third parties over the past six years. In furtherance of this work, McMillan and NorthStar have spent millions of dollars and loaned Nelson and other

2

members substantial sums of money so that they would not be forced to sell their own interests in the Prince Estate at a steep discount. McMillan's work and investment has resulted in Nelson's enrichment and current wealthy status, leading to millions of dollars she may never have received without his efforts.

8.      Nelson sought out McMillan's assistance and loans from McMillan because she did not have sufficient financial means during the pendency of the Prince probate proceedings to protect her interests and support herself and no one else would provide her with assistance.

9.      Nelson appreciated the assistance and loans and promised to repay McMillan and NorthStar when Prince's assets where distributed.

10.      When McMillan was providing them with loans, paying their debts, and advocating for them in the probate proceeding and in other legal disputes, Nelson and her direct siblings were supportive and complimentary of him. During the pendency of the probate proceeding, Nelson directed her ire at the court-appointed personal representative of Prince's Estate, Comerica Bank, which she viewed at that time to be the chief obstacle to her plans for personal control and exploitation of Prince's assets and legacy, and her receipt of distribution of Estate funds.  Nelson later filed an action against Comerica Bank seeking $10 billion.  Nelson has a mind of her own.

11.      However, once McMillan and co-manager Charles Spicer ("Spicer") were selected and became managing members of Prince Legacy, they became the main obstacle standing between Nelson and full control over Prince's assets and legacy to which she feels

she is entitled, despite previously agreeing to and advocating for the ownership structure of Prince Legacy, and also despite previously proposing transfer of portions of her interest.

12.    Since McMillan and Spicer became managing members, they have been harassed, threatened, defamed and strategically undermined by Nelson, as well as several of her siblings and enablers. Even though throughout her life Nelson had conflicts with Prince, following his death, she has exploited her status as Prince's familial relation to seek fame, fortune and power for herself, at the expense of Prince's legacy and those who seek to preserve and protect it.

13.    At the time Prince Legacy was formed, and throughout the probate process and the closing of the Estate, Nelson and her independent legal counsel were heavily involved in installing corporate protections to ensure that the Company's control over its share of Prince's assets would not be susceptible to outside influence. However, Nelson soon became unhappy when the other members of Prince Legacy ("Members") did not approve of the unilateral, unauthorized, self-serving and damaging actions she attempted to take in connection with Prince's assets and prevented her from doing what she wanted.

14.    Nelson further grew upset with McMillan and Spicer when they sided with the majority of the Members and would not acquiesce to her attempts to marginalize Johnny, Allen and Breanna Nelson (the children of Prince's brother John R. Nelson ) within Prince Legacy. Instead of engaging with McMillan and Spicer and the other Members, Nelson withdrew and took to conspiring with outsiders as to how she could exert her own influence. She directed her anger at McMillan and Spicer, much as she had previously

directed it at Comerica Bank, viewing them as the main obstacle to her being able to do what she pleased and felt was her right of inheritance, irrespective of others.

15.    McMillan and Spicer were previously warned by other Members of Prince Legacy that they should take immediate action to stop Nelson. In fact, the Members voted for McMillan and Spicer to take appropriate and immediate action against Nelson and to reduce her access to confidential information.  However, in an effort to quietly resolve matters and generate resources for Nelson and the Members, rather than cause greater conflict, McMillan and Spicer attempted to engage Nelson in discussions concerning her perceived issues. For substantially over a year, Nelson has refused to engage in any meaningful way and has doubled down on her actions by making and continuing to aid and promote a steady stream of false and defamatory accusations against Plaintiffs and Spicer. Nelson has continuously attempted to undermine Prince Legacy by conspiring with third parties against Prince Legacy and its management, and by attempting to sell her interests in the Company in violation of the Prince Legacy Operating Agreement, regardless of how such actions would negatively impact Prince's assets and legacy. After months of harassment and false claims, Nelson also convinced certain other Members to also wrongfully take action in violation of the Prince Legacy Operating Agreement which resulted in costly and protracted litigation in the State of Delaware.

## COUNT I
**Breach of Contract - Promissory Note**
**NorthStar v. Sharon Nelson**

16.     On or around August 31, 2017, Nelson signed a Promissory Note promising to pay "NorthStar Business Enterprises, LLC, as directed by McMillan (the 'Lender')," the principal sum of $500,000, bearing interest at the rate of 2.75% per annum.

17.     Under the Note, the principal sum was to be paid "no later than September 1, 2018."

18.     To date, Nelson has not paid the principal sum and interest owed to NorthStar under the Promissory Note.

19.     The Promissory Note is valid and enforceable because it was agreed to by the parties and is supported by adequate consideration. On multiple occasions Nelson has acknowledged her indebtedness to McMillan.

20.     NorthStar performed all of its obligations under the Promissory Note.

21.     Nelson has materially breached the Promissory Note by failing to make any repayment by the due date set forth in the Note.

22.     NorthStar has been harmed by Nelson's material breaches and is entitled to monetary relief in the amount of $500,000.00, plus 2.5% interest and reasonable attorneys' fees and expenses pursuant to contract to remedy Nelson's breach.

## COUNT II
**Breach of Contract**
**McMillan v. Sharon Nelson**

23.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

24.     Nelson requested McMillan loan her monies at various times throughout the pendency of the legal proceedings probating Prince's Estate.

25.     In addition to the Promissory note, McMillan made loans for substantial sums to Nelson in excess of $800,000.00, in addition to providing other professional services.

26.     On multiple occasions Nelson has acknowledged her indebtedness to McMillan.

27.     Nelson has not repaid these sums.

28.     At the request of Nelson and others, McMillan paid attorneys' liens to the law firms of Skolnick & Joyce P.A., Hansen, Dordell, Bradt, Odlaug and Bradt, PLLP, and Lommen Abdo P.A. in the total amount of $465,000.00.

29.      Nelson agreed to repay one-third of the lien payoff amount to McMillan.

30.     McMillan paid these attorneys' liens because they were required to be paid prior to closing the Estate, and Nelson did not have the financial resources available to pay them.

31.     Despite acknowledging her indebtedness and agreeing to repay the loans, Nelson has not repaid McMillan.

32.      It has now been two years since McMillan made these payments, and Nelson has since received an ownership share of Princy Legacy worth millions of dollars. Nelson has not reimbursed McMillan for any amount of the attorneys' liens or other loans he paid despite her agreement to do so.

33.     As a result of her failure to repay McMillan, Nelson is in breach of her agreement with McMillan.

34.     Nelson's breach of the agreement has caused damage to McMillian for the amount paid.

### COUNT III
### UNJUST ENRICHMENT
### L. Londell McMillan and NorthStar v. Sharon Nelson

35.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

36.     McMillan and NorthStar provided loans to Sharon Nelson collectively totaling in excess of $1,300,000.00.

37.     McMillan provided these loans to Nelson because during the pendency of the probate proceeding, she lacked the financial resources to find a place to live, pay for her living expenses and healthcare, and repay her existing debts, among other things.

38.     Nelson requested the amounts loaned, agreed to repay McMillan and NorthStar the loaned amounts, and accepted and benefited from the loaned amounts.

39.     Despite the fact that Nelson has since received ownership shares of Princy Legacy worth millions of dollars, she has not reimbursed McMillan for any amount of the attorneys' liens he paid despite her agreement to do so.

40.     It is inequitable for Nelson to retain the loaned amounts to the detriment of McMillan and NorthStar in light of her agreement to repay McMillan and NorthStar such that Nelson has been unjustly enriched by her continued retention of the benefits provided by McMillan and NorthStar.

8

41.     NorthStar and McMillan are entitled to judgment against Nelson for an amount to be proven at trial that Nelson has been unjustly enriched at NorthStar and McMillan's expense.

### COUNT IV – BUSINESS DISPARAGEMENT – DEFAMATION
**L. Londell McMillan and NorthStar v. Sharon Nelson**

42.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

43.     Prior to his death, Prince was estranged from Nelson primarily due to her self-entitlement and an interview she gave on the prime-time tabloid television show "A Current Affair" in 1991. Prince learned ahead of time that Nelson planned to participate in the interview for the purpose of sharing details about his personal life and his childhood, and he was furious. Nelson was well aware that Prince, a notoriously private and reclusive person, did not want her to do the interview, but she insisted on participating anyway.[1]

44.     By appearing on "A Current Affair" and publicly disclosing details about her half-brother against his wishes, Nelson gained widespread media attention, and for a period, became a minor celebrity.

45.     During the interview, Nelson called Prince short, "spoiled," and "the Prince of Darkness."

46.     After the interview, Prince stopped speaking to Nelson. During Prince's life, she would communicate with McMillan to try and reach Prince, her brother.

---

[1] https://www.youtube.com/watch?v=Byr-TaMi0gA

9

47.     Since Prince died without a will, Nelson was recognized as an heir pursuant to the provisions of the Minnesota probate statutes. Since then, she has consistently proceeded in the belief that she, and she alone, should be entitled to control Prince's assets (despite what the agreements or others say), and she has single-mindedly sought to speak publicly and take as much control as she can, no matter how outrageous and baseless her communications and claims to such control may be.

48.     During the six years of Prince's probate proceeding, Nelson waged a years-long scorched earth campaign against Comerica Bank. Nelson sought to drastically limit its control of the Estate and to have it removed as personal representative.

49.     Nelson submitted more than thirty-two objections, petitions, and letters to the Court opposing Comerica Bank's actions in the probate case, which were mostly rejected by the Court.

50.     This culminated in February 2019 when Nelson filed a lawsuit against Comerica Bank and two of its executives, claiming breach of fiduciary duty, fraud, fraudulent misrepresentation, civil conspiracy and civil assault, and seeking $138,300,000 in damages and $10,000,000,000 (ten billion dollars) in "additional damages."

51.     Neither Norrine nor John Nelson joined Nelson as plaintiffs in this lawsuit.

52.     By Order dated August 13, 2019, the Probate Court dismissed all of Nelson's claims, finding that nearly all of them had already been raised and adjudicated through Nelson's numerous prior submissions to the Court.

53.     The Probate Court further ordered sanctions against Nelson, finding that her claims were "factually and legally unwarranted, and were asserted for improper purpose."

Nelson appealed the Probate Court's decision. The Appellate Court affirmed the Probate Court's findings that she had filed the action for an improper purpose and that sanctions were warranted. Dismissal of the fiduciary, fraud and conspiracy claims was affirmed. The civil assault claim was remanded to be consolidated with the probate proceeding, where it was settled for a nominal amount prior to the closing of the Estate.

54.     Once Prince Legacy had been formed and the assets of the Estate distributed to the heirs and beneficiaries, Nelson's cycle of unreasonable behavior resumed. Despite having been instrumental in formulating key terms of the Prince Legacy Operating Agreement relating to control and transfer of interests and having recommended Spicer to serve as a managing member with McMillan, Nelson was irate when her immediate and unreasonable demands regarding management of Prince Legacy's business were not implemented. Further, she was offended that her actions concerning certain Prince Estate assets were subject to approval by the other Members of Prince Legacy who were not willing to grant her complete and unilateral control, which was contrary to the terms of the Prince Legacy Operating Agreement and the discussions leading to its formation.

55.     Shortly after the distribution of the Estate in August 2022, Nelson demanded that the lead security manager and entire staff of Paisley Park be fired and replaced with employees of her choosing. The other Members declined, viewing this action as unwarranted and highly disruptive to Paisley Park's business. Nelson was being misguided by former Paisley Park employees

56.     Nelson also appeared at Paisley Park and informed the director of the facility that she required her own private office, that she would be coming to work there each day

and would be in charge of Paisley Park going forward.  Nelson was prevented from taking these unilateral actions as they lacked support of the other Members or of Paisley Park staff.

57.     On or around November 2022, Nelson and certain of her associates sought to take advantage of her position as a Member of the Prince Legacy by demanding that lavish events be thrown at Paisley Park for the benefit of her and her friends, solely at the expense of the Paisley Park organization. However, her requests were denied as unreasonable and financially imprudent, not only by McMillan and Spicer, but by staff at Paisley Park and other members of Prince Legacy.

58.     Nelson also attempted to block Breanna, Johnny and Allen Nelson, the co-trustees of the John Nelson's Trust, from receiving Company business information and attending members' meetings, claiming that they were not true family members or legitimate owners of the Prince Estate's assets.  McMillan and Spicer objected to her efforts and ensured that the co-trustees' interests were protected.

59.     In turn, Breanna and other Members privately urged McMillan and Spicer to block Nelson's actions if they were interfering with Prince Legacy and Paisley Park policies and to take legal action against Nelson if necessary.

60.     Nelson has continued to treat Prince in much the same way she did when he was alive, by flaunting her connection with him, not in furtherance of his legacy, but rather in pursuit of her own celebrity and financial gain. The rejection of Nelson's personal demands infuriated her, and upon information and belief, she began to plot with other non-member associates about ways that she could acquire full control over Prince Legacy and

Prince's assets, as well as to punish McMillan and Spicer for not acquiescing to her demands. Nelson viewed McMillan and Spicer – managing members who Nelson herself had approved of and agreed to – as obstacles to wielding the kind of unilateral power over Prince's assets that she felt that she was entitled to, much as she previously viewed Comerica as such an obstacle when it was serving as personal representative.

61.     However, her demands were denied as unreasonable and financially imprudent by McMillan, Spicer, and other members of Prince Legacy.

62.     Upon information and belief, this infuriated Nelson, who plotted ways that she could acquire more control over Prince Legacy and Prince's assets.

63.     However, Nelson never raised her issues in Prince Legacy meetings, nor did she make any attempt to engage McMillan and Spicer regarding her concerns.

64.     Instead, on November 30, 2022, just four months after she celebrated the closing of the Estate, Nelson sent a letter to McMillan and Spicer in which she accused them of "swindling" and "defrauding" her, accused them of setting up [Prince Legacy, LLC] for the sole purpose of "giv[ing them] complete control over [her] money."  She further claimed that they had "blocked all of [her] rights with respect to [her] remaining interest."

65.     McMillan and Spicer were shocked to receive this letter, as these accusations were entirely baseless, and this was the first time that Nelson had ever expressed any of these accusations to them.

66.     Nelson threatened that "several litigators" and the Minnesota Attorney General would "litigate against [McMillan and Spicer] immediately" if they did not

"immediately" resign their positions as Managing Members of Prince Legacy, and "relinquish all interests in [Prince Legacy]," and that she expected McMillan and Spicer's "response, resignation and assignment of [their] interest back to the remaining Members of [Prince Legacy]" within eight days.

67.     Nelson's letter to McMillan and Spicer contained numerous false and defamatory accusations, including the following:

- You are "blocking me from my assets."

- "I have no access to corporate records or corporate documents […]"

- "I am blind to any Company financials."

- "You manufactured this specific moment [the signing of the Expectancy Agreement] just to take control of my assets and block me from them."

- "I now have no control over anything [as part of Prince Legacy]. . . .  I am Powerless!"

- "[The first Estate distribution] was funneled through the Company's bank account which I understand is located in New York. . . "

- "[T]hat money [the second distribution] is still sitting in Londell's bank account."

68.     In addition to making such wildly false and defamatory statements and other false statements, Nelson attempted to extort McMillan and Spicer. Specifically, Nelson threatened to publish her letter and sue McMillan and Spicer if they refused to resign as Managing Members of Prince Legacy and if they did not assign their interest back to the other Members.

14

69.     Nelson shared this intentionally disparaging letter and other confidential business information of Prince Legacy with third parties, including officers and employees of Paisley Park.

70.     All of the foregoing statements made by Nelson are false.

71.     None of the foregoing statements are privileged.

72.     By the foregoing statements, among others, Nelson has publicly disparaged Plaintiffs' services and businesses.

73.     At the time Nelson made the foregoing statements, she knew the foregoing statements were false or willfully and recklessly disregarded the falsity of such statements.

74.     On December 6, 2022, counsel for McMillan and Spicer sent Nelson a letter demanding that she immediately stop (i) making demands and threats or taking actions that violated the Prince Legacy Operating Agreement; (ii) demanding and threatening that McMillan and Spicer must take actions that would violate the Prince Legacy Operating Agreement; (iii) making false statements concerning McMillan and Spicer and communicating them to third parties, (iv) making threats to McMillan's business livelihood or reputation that are intended to force him to resign from Prince Legacy, and (v) sharing Prince Legacy's confidential business information with third parties.

75.     Neither Nelson nor her legal counsel responded to this letter.

76.     In 2022, Norrine Nelson and other Nelson family members directed and encouraged McMillan and Spicer to file a lawsuit against Sharon Nelson to stop her improper, self-serving and destructive acts that threatened to harm Prince's legacy. Upon information and belief, at this time Nelson was unsuccessful in convincing a lawyer to

15

bring the lawsuit she threatened, so she instead focused on attempting to embarrass and undermine McMillan and Spicer (and thus, Prince Legacy itself) by working in collusion with third parties and outside agitators.

**"Vanessa Bartholomew"**

77.     Beginning in April 2023, an individual using the name "Vanessa Bartholomew" began posting the first of a series of fifteen videos on her YouTube channel and across other social media channels where she has made repeated false and defamatory statements concerning McMillan and Spicer and their involvement with Nelson and Prince Legacy. Vanessa Bartholomew is a fake name that was used by the actress Kirstie Alley in a Prince video. Bartholomew has refused to disclose her true identity.

78.     Many of these videos repeat the same false and defamatory statements made by Nelson in her November 30, 2022, letter.

79.     Bartholomew has also, through her YouTube channel, publicly disclosed highly confidential information concerning Prince Legacy's business deals, as well as the terms of confidential business documents, including the Prince Legacy Operating Agreement. This information was only known to Prince Legacy Members,

80.     Nelson has confirmed that she communicated with "Vanessa Bartholomew" and has refused to provide any further information about her.

81.     Upon information and belief, Nelson has conveyed her false and defamatory accusations to Bartholomew, with the intent and agreement that they be disseminated publicly through Bartholomew's YouTube account and social media in a manner that will not be traced back to Nelson.

16

82.     Upon information and belief, Nelson has also provided Bartholomew with highly confidential information concerning Prince Legacy's business deals and operations, including the management of Paisley Park, and has provided Bartholomew with Prince Legacy's confidential business documents with the knowledge that all such information would be publicly disclosed through Bartholomew's YouTube channel and social media with the intent to discredit and harm McMillan and Spicer.

83.     On August 6, 2024, the Dakota County District Court issued Findings of Fact, Conclusions of Law and Order granting Charles Spicer, L. Londell McMillan and Paisley Park Enterprises, LLC's motion for a temporary injunction, directing Vanessa Bartholomew to immediately remove the YouTube videos from all social media platforms and directing her not to post defamatory videos and/or defamatory statements about the Plaintiffs.

84.     Nelson has also promoted and "retweeted" links to Bartholomew's videos. On April 20, 2023, both Breanna and Johnny wrote to Nelson, objecting to her posting and promoting false information concerning McMillan and Spicer, and asking Nelson to take her posts down. Nelson did not comply with their request.

85.     Also on April 20, 2023, Breanna responded by email to President Nelson, son of Prince's sister Tyka, writing that "[a]ll LLCs have managing members with an Operating Agreement and we all voted to have [McMillan] and [Spicer] serve as managers, we think they are doing a terrific job, we all have input despite what you may have heard or read from Sharon."

17

86.     Following her November 2022 letter, the Managing Members reached out to Nelson several times asking if she wished to engage in further discussions among the Members about selling her interests in Prince Legacy, in accordance with the transfer and sales procedures set forth in the Prince Legacy Operating Agreement. Nelson did not respond to any of these queries, nor did she raise the issue at any Members' meetings.

87.     Instead, Nelson attempted to covertly sell her interests in Prince Legacy in a manner prohibited by the LLC Agreement.  In or around March 2023, she contacted Prince OAT directly and offered to sell her interests, in direct and willful violation of Section 7.1 of the Prince Legacy Operating Agreement which requires unanimous consent of the Members to sell and requires that she first offer her interest to Prince Legacy and then to each of the Members. In light of prior discussions where McMillan and Spicer had conveyed their view that Prince OAT's business communications with Prince Legacy Members were improper, Prince OAT informed McMillan and Spicer of Nelson's offer.

88.     Upon information and belief, Nelson's actions have been taken with consultation and advice from certain local associates of Nelsons who have no relation to Prince or his business and are seeking to assert their influence over the management of his assets, including Paisley Park, through Nelson's role as a Member of Prince Legacy.

89.     As set forth above, Nelson published multiple false, defamatory statements that referred to McMillan and Spicer.

90.     At the time Nelson published the statements she knew the statements were false or made the statements with willful and reckless disregard for the falsity of the statements.

18

91.    Viewers of the false statements and accusations would reasonably understand that Nelson was referring to Plaintiff McMillan and to Spicer.

92.    By and through the foregoing statements and accusations, Nelson publicly and falsely accused McMillan and Spicer of engaging in illegal conduct including, *inter alia*, fraud and embezzlement.

93.    Nelson's false and defamatory statements harmed Plaintiff McMillian and Spicer's reputations in the community and lowered their estimation in the community.

94.    Nelson's defamatory statements caused damage to Plaintiff McMillan, including economic loss, emotional distress, humiliation, and embarrassment in excess of $50,000.00, the specific amount of said damages to be proven at trial.

95.    Plaintiff McMillan is entitled to injunctive relief, including a permanent injunction enjoining Nelson from distributing the defamatory and disparaging statement to any third party and from distributing them, either directly or indirectly, in any public forum.

96.    The false and defamatory statements made by Nelson against McMillan constitute defamation per se.

## JURY TRIAL DEMAND

97.    Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1.    Awarding Plaintiffs their damages on all of the above counts in an amount in excess of $50,000, the exact amount to be established at trial.

2.    Entering judgment against Defendant Sharon Nelson in favor of NorthStar for Sharon Nelson's breaches of contracts as set forth above in an amount in excess of $50,000, the exact amount to be established at trial.

3.    Entering judgment against Defendant Sharon Nelson in favor of McMillan for Sharon Nelson's breaches of contracts as set forth above in an amount in excess of $50,000, the exact amount to be established at trial.

4.    In the alternative, entering judgment against Defendant Sharon Nelson in favor of McMillan and NorthStar for an amount in excess of $50,000, the exact amount to be established at trial, in which Sharon Nelson was unjustly enriched.

5.    Entering judgment against Defendant Sharon Nelson and in favor of McMillan for an amount in excess of $50,000 for business disparagement and defamation.

6.    Awarding Plaintiffs their costs and disbursements, including attorneys' fees, expenses, and pre and post judgment interest as allowable by law or contract.

7.    Awarding Plaintiffs such other and further relief as the Court deems just and equitable.

**BASSFORD REMELE**
*A Professional Association*

Dated:  September 17, 2024        By:  /s/  Alan I. Silver
                                     Alan I. Silver (MN #101023)
                                     Tal Bakke (MN #398215)
                                     100 South 5th Street, Suite 1500
                                     Minneapolis, MN 55402-1254
                                     Telephone:  (612) 333-3000
                                     Facsimile:  (612) 333-8829
                                     Email:   asilver@bassford.com
                                              tbakke@bassford.com

                                *Attorneys for Plaintiffs*